ABCO OIL CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
ABCO Oil Corp. v. Commissioner
Docket No. 20356-84
United States Tax Court
T.C. Memo 1990-40; 1990 Tax Ct. Memo LEXIS 40; 58 T.C.M. (CCH) 1280; T.C.M. (RIA) 90040; January 23, 1990
Barry H. Frank and Luther E. Weaver, III, for the petitioner. James P. Clancy, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioner's Federal income tax for 1980 and 1981 in the amounts of $ 19,774 and $ 29,948, respectively. The issues for decision are: (1) whether petitioner, a fuel oil distributor, is entitled to amortize customer lists acquired in connection with the purchase of various assets of two competitors; and (2) whether petitioner may deduct the remaining amount owed under two covenants not to compete (acquired in connection with the purchase of the business of one of said competitors) upon the deaths of the covenantors.
*41 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner, a Pennsylvania corporation having at all material times (including the date of filing the petition herein) its principal place of business in Norristown, Pennsylvania, is engaged in the business of selling and delivering fuel oil to residential and commercial customers in the Norristown area. It is a full service distributor which not only sells fuel oil on credit but also installs, repairs and services oil heating equipment. Prior to May, 1980, petitioner operated under the name Norristown Heat & Fuel Co. At all relevant times, Robert Gosin (Gosin) was petitioner's sole shareholder and president. Michael S. Panczak (Panczak) was a competitor of petitioner. In the late summer of 1979, Panczak contacted Gosin offering to sell his fuel oil business to petitioner. Panczak's offer was accepted, and on October 18, 1979, the parties entered into a written agreement pursuant to which petitioner agreed to purchase certain assets used in Panczak's business, including his customer list, a tank *42 truck, and his inventory. Panczak's customer list was in the form of cards, one for each customer. The cards contained information as to the customer's name, address, home and work phone numbers, the size and location of the oil tank, information about filling the tanks, the customer's oil burning needs, whether the oil was used for hot water as well as heat, the specific burning rate of the burner, whether the customer was covered by a service contract, and whether the sale of the oil to the customer was subject to sales tax. The amount set forth in the agreement for the customer list was $ 120,000, which was paid to Panczak at settlement. Panczak's customer list consisted of 783 customers. As of December 31, 1982, 60 percent of the customers obtained from Panczak no longer did business with petitioner. Panczak agreed to relinquish the use of the name "Michael S. Panczak Fuel" as well as the use of the name "Panczak" in connection with the word "fuel." The agreement required Panczak to cooperate in having his phone number transferred to petitioner and to assist petitioner in retaining Panczak's customers up to and including the date of settlement. Flad Fuel Company, Inc. *43 (Flad) was also a competitor of petitioner. In late 1979, Robert G. Flad, president of Flad Oil Company (Flad), contacted Gosin and the former offered to sell Flad's business to petitioner. Flad's offer was accepted and on October 20, 1979, the parties entered into a written agreement pursuant to which petitioner purchased certain assets used in Flad's business, including its customer list. The amount set forth in the agreement for the Flad customer list was $ 185,000, payable in installments over a five year period. The customer list acquired from Flad (also in the form of cards containing information similar to that set forth in the cards obtained from Panczak) consisted of 981 customers. As of December 31, 1982, 62 percent of the customers obtained from Flad no longer did business with petitioner. The Flad agreement was similar to the Panczak agreement in that petitioner acquired the right to use the name "Flad Fuel Company, Inc." Further, Flad agreed to cooperate in having its phone number transferred to petitioner and to assist petitioner in retaining its customers up to and including the date of settlement. Neither the Panczak nor Flad agreement provided for the transfer *44 of goodwill, nor did either allocate any value to goodwill. Prior to purchasing Panczak's and Flad's businesses, Gosin reviewed the information on the Panczak and Flad customer cards with respect to the quantity of fuel which during the past year had been sold to customers. The amount petitioner paid for both customer lists was based on an industry standard, which was an amount equal to 80 percent of the aggregate price paid by customers for fuel oil less the distributor's cost for the oil. After selling their fuel oil supply businesses to petitioner, both Flad and Panczak remained in the area, performing sales, installation, and service for heating and air conditioning equipment. They remained in their old locations and used the same business signs that they had used before the sale. Petitioner wrote each of the persons named on the lists acquired and informed them of the transfer. It kept the Panczak and Flad phone numbers and listed them in the phone book. Petitioner never used the names of either Flad or Panczak on signs outside its location. Petitioner had the delivery trucks purchased from both Flad and Panczak repainted in its own colors and logo before placing them *45 into service. When a customer received a delivery of oil, he was given a delivery ticket that bore petitioner's name. When bills were sent to customers, petitioner's address was given as the return address and was printed on an enclosed return envelope. Petitioner hired one of the deliverymen previously employed by Flad and two of the deliverymen previously employed by Panczak. These new employees were given petitioner's uniforms to wear which differed colorwise from the Panczak and Flad uniforms. Petitioner leased a part of Flad's storage facility for a brief period following the sale but conducted no other business on Flad or Panczak property. In 1980, the fuel oil business was extremely competitive in the Norristown geographical area. There were at least 40 other companies vying for petitioner's customers. As the price of oil and gas rose in the 1970s, customers became primarily interested in the price charged for the fuel rather than the quality of service. Fuel oil discounters, who offered few or no services, obtained an increasing share of the market. During the early 1980s, in the geographical area serviced by petitioner, the average annual customer turnover rate was *46 20 percent. As part of the Flad agreement, petitioner obtained covenants not to compete from Flad, Robert Flad, Marion Flad, and Gregory Flad (the Flad covenants). Robert and Marion Flad were married; Gregory Flad was their son. Both Robert and Marion Flad were officers of Flad, and as of the time of sale, both had been involved in the retail fuel oil supply business for many years. Gregory Flad, on the other hand, had been working in the fuel oil supply business for less than a year. Each covenant was for a five year period. The stated consideration for the Flad covenants was $ 25,000 which was paid to the three Flad individuals (and not to the company) as follows: Robert Flad
$ 12,000
Marion Flad
$ 12,000
Gregory Flad
$  1,000
TOTAL
$ 25,000
Each noncompetition agreement provided that the rights and duties contained therein would be binding upon, and would inure to the benefit of, the personal representatives and heirs of the covenantors. Payments by petitioner for such covenants were to be made in five equal annual installments of $ 2,400 to Robert Flad, $ 2,400 to Marion Flad, and $ 200 to Gregory Flad, beginning in 1980. The required *47 payments to the Flads were made in 1980 and 1981. Robert and Marion Flad both died in the latter part of 1981. Petitioner continued to make payments to Robert and Marion Flad until January, 1985, in accordance with the 5-year payment schedule. The checks were made payable to Robert and Marion Flad (even though they were deceased) pursuant to the instructions of the attorneys representing their estates. Petitioner maintained its books, and filed its tax returns, using the accrual method of accounting. On its 1981 return, petitioner deducted $ 5,000 for amortization of the Flad covenants and deducted the remaining $ 15,000 payable for the Flad covenants. Petitioner also claimed deductions for amortization of the Panczak and Flad customer lists on its 1980 and 1981 tax returns. Respondent disallowed these deductions. OPINION The first issue to be decided is whether petitioner is entitled to amortize the Panczak and Flad customer lists. A customer list is an intangible asset which may be amortized if it has a useful business life of limited duration, the length of which can be estimated *48 with reasonable accuracy. Goodwill, on the other hand, does not have a limited useful business life and thus is not amortizable. Section 1.167(a)-3, Income Tax Regs.
Respondent claims that petitioner is not entitled to amortize either the Panczak or Flad customer lists, contending that (a) the lists do not have an ascertainable value separate and apart from that of goodwill, and (b) the lists do not have a limited business life ascertainable with reasonable certainty. The determination as to whether a customer list has value independent of goodwill and, if so, the amount of that value, is a question of fact. Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240, 1245 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974); Citizens and Southern Corp. v. Commissioner, 91 T.C. 463, 479 (1988). The record herein clearly supports a finding, and we so find, that both the Panczak and Flad customer lists have independent value. Indeed, respondent's expert conceded such on the stand. Petitioner's agreements *49 with Panczak and Flad contained no reference to the transfer of goodwill. Petitioner claims it did not want to acquire Panczak's and Flad's goodwill; to the contrary, petitioner claims it wanted to disassociate itself from the Panczak and Flad operations. By way of disassociating itself from the Panczak and Flad operations, petitioner states it (1) repainted and put its name on the trucks acquired from Panczak and Flad, (2) required the drivers formerly employed by Panczak and Flad to wear petitioner's uniforms which colorwise differed from the Panczak and Flad uniforms; and (3) placed its name on all delivery slips, invoices, service orders, and invoice return envelopes. Notwithstanding these acts, we believe petitioner, to a limited extent, desired to preserve Panczak and Flad customer continuity. It would be naive for us to believe that petitioner did not attempt to preserve the patronage of the former customers of Panczak and Flad when it notified the former customers of Panczak and Flad that it had acquired the latter's businesses and when it kept the Panczak and Flad phone numbers and listed them in the phone book. These actions obviously were taken to maintain for petitioner *50 the patronage of the Panczak and Flad customers -- and continued customer patronage is the essence of goodwill. Accordingly, we believe a portion of the amounts putatively paid for the customer lists must be allocated to goodwill. Although a specific allocation in the purchase agreement, or in the negotiations leading thereto, may be the best evidence in determining the cost basis of an asset, if such evidence is not available, then we must make such an allocation on other available evidence. Citizens and Southern Corp. v. Commissioner, supra at 495. As is frequently the case, here the record is less than desirable. Nonetheless, we are satisifed that we can make an allocation between the customer lists and goodwill. See Manhattan Co. of Virginia, Inc. v. Commissioner, 50 T.C. 78 (1968). Based on the record before us, we conclude that 25 percent of the stated amount for the customer lists is properly allocable to goodwill and the remaining 75 percent of the stated amount is properly allocable to the customer lists. Dollarwise, we find the following amounts to be the respective cost bases for the customer lists and goodwill: Customer List
Goodwill
Panczak
$  90,000
$  30,000
Flad
138,750
46,250
*51 Having ascertained the cost bases for the customer lists, we now turn to whether such lists have a limited business life. We find that they do. In determining whether an intangible, such as a customer list, has a limited business life, we consider a number of factors, including: testimony of expert witnesses, experience in the industry, testimony of officers, relationship of geographic area and the customers involved, turnover of customers (both before and after the acquisition of the list), and other pertinent factors. See Holden Fuel Oil Co. v. Commissioner, 479 F.2d 613 (6th Cir. 1973), affirming T.C. Memo. 1972-45; Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974); Manhattan Co. of Virginia, Inc. v. Commissioner, 50 T.C. 78 (1968). Gosin and Samuel Borenkind (Borenkind) were credible witnesses. Gosin had 16 years' experience in the fuel oil business at the time the Panczak and Flad customer lists were acquired. He was thoroughly familiar *52 with the territories in which Panczak and Flad operated. Testifying from his own actual experience in the Norristown area, he said the annual customer turnover rate was 20 percent. Borenkind, an individual with over 50 years' experience in the fuel oil business, corroborated Gosin's testimony. Borenkind stated that in 1979 the average life of a residential fuel oil account was seven years; however, in the Norristown area (because of its economic condition) the average account life was only five years. In Banc One Corp. v. Commissioner, 84 T.C. 476, 499 (1985), affd. without published opinion, 815 F.2d 75 (6th Cir., 1987), we said: A taxpayer may establish the useful life of an asset for depreciation based upon his own experience with similar property or, if his own experience is inadequate, based upon the general experience in the industry. The taxpayer need only determine a "reasonable approximation" for depreciation; absolute certainty is not required. As the Supreme Court noted in Massey Motors, Inc. v. United States, 364 U.S. 92, 105 (1960): *53 "prediction is the very essence of depreciation accounting." This Court and others have repeatedly stated, however, that the determination of the useful life of an asset and the other estimates utilized in computing depreciation must be based upon facts existing as of the close of the taxable year in issue. (Emphasis added; citations omitted.) From 1980 to 1983, petitioner actually experienced customer turnover of 20 percent per year with respect to those customers obtained from the Panczak and Flad customer lists. Such subsequent experience further corroborates petitioner's projection. Respondent failed to produce any meaningful evidence to contradict the testimony of Gosin and Borenkind. Accordingly, we find that the Panczak and Flad customer lists each had a limited useful life of five years. The second issue to be decided is whether petitioner may write-off in 1981 the remaining amount owed Robert and Marion Flad pursuant to their covenants not to compete as a result of their deaths. [1] We conclude it may not. [1]
*54 Petitioner contends that upon the deaths of Robert and Marion Flad their covenants not to compete became worthless. It seeks sustenance from section 1.167(a)-8(a)(3), Income Tax Regs. That section, in pertinent part, provides: Where an asset is permanently retired from use in the trade or business * * * loss will be recognized [and will be] measured by the excess of the adjusted basis of the asset at the time of retirement over * * * the fair market value at the time of such retirement * * * As a general rule, a loss incurred with respect to an asset used in one's trade or business is recognized only upon sale or other disposition. Section 1.167(a)-8(a)(3) of the regulations is an exception to this rule. It allows a loss for the retirement of depreciable property without actual disposition. A covenant not to compete is an intangible asset which is amortizable over the life of the covenant even if the period over which payments are made is not coterminous with *55 the duration of the covenant. Cf. Warsaw Photographic Associates v. Commissioner, 84 T.C. 21, 48-49 (1985). In our opinion, within the context of section 1.167(a)-8(a)(3), Income Tax Regs., a covenant not to compete is not an asset which can be "permanently retired from use in the trade or business" upon the death of the covenantor; thus, we believe said regulation is not applicable in resolving the issue before us. Here, petitioner bargained for a five year period of noncompetition from Robert and Marion Flad. The covenantors' deaths did not prevent petitioner from receiving the benefit of its bargain. The covenantors' deaths did not result in a shortening of the duration of the noncompetition period; to the contrary, their deaths extended forever the duration of noncompetition and assured petitioner that Robert and Marion Flad would never be a deleterious competitive force. Hence, petitioner suffered no loss upon the covenantors' death. Deductions are a matter of legislative grace. They are allowable only if there is clear statutory authority providing therefor. New Colonial Ice Co. v. Commissioner, 292 U.S. 435, 440 (1934). *56 Petitioner cites no authority for the write-off of the Flad covenants other than section 1.167(a)-8(a)(3), Income Tax Regs., which, as we have stated, is not applicable to the situation involved herein. Petitioner has failed to prove that it suffered a loss as a result of the deaths of Robert and Marion Flad. Accordingly, we hold that petitioner is not entitled to the claimed write-off. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Petitioner wrote-off the remaining amount owed to Gregory Flad; such a write-off was clearly erroneous inasmuch as Gregory Flad was alive in 1981.↩